𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔆𝔬𝔲𝔯𝔱
𝔉𝔬𝔯 𝔱𝔥𝔢 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔬𝔣 𝔆𝔬𝔩𝔲𝔪𝔟𝔦𝔞

-------------------------------------------------------------X

UNITED STATES OF AMERICA,

                                                     Case #: 1:21-cr-225 (DLF)

                *v.*                                  **DECLARATION OF**
                                                    **TRENISS EVANS III**
                                                **IN SUPPORT OF REPLY FOR**
                                                  **EARLY TERMINATION**

TRENISS JEWELL EVANS III,

                                              *Defendant.*

-------------------------------------------------------------X

**DEFENDANT'S REPLY TO THE GOVERNMENT'S OPPOSITION
TO EARLY TERMINATION OF PROBATION**

      TRENISS JEWELL EVANS III, declares under penalty of perjury pursuant to 28 U.S.C. § 1746, and with assistance from counsel, Mr. Evans hereby submits this declaration as his brief in support of his motion for early termination of supervised release pursuant to 18 U.S.C. § 3583(e)(1); addressed herein are, *inter alia*, both the improper imposition of the sentence in the first place, the extraordinary circumstances presented by government misconduct, and Mr. Evans' exemplary behavior. In support of such claims, I hereby attest that the following statements are true and correct:

      1.     I remain represented by Metcalf & Metcalf, P.C., in the above captioned case against me, who assisted in the preparation of this declaration.

      2.     I make this declaration based on information and belief, and even such statements I believe to be true and correct to the best of my ability.

3.      With that said, the statements contained herein are not merely personal grievances; they are assaults on our nation's core principles. The government's mischaracterization of my dissatisfaction deflects from the truth, seeking to obscure their abuse of power and the injustice I have endured for approximately the last three years.

4.      My actions on January 6th were in pursuit of peace, not violence. I took deliberate steps to de-escalate the situation and promote non-violence. Despite my strongest desire to demonstrate, I abandoned the demonstration effort after becoming aware of the circumstances I had walked into were inconsistent with my views on demonstration in some respects. Yet, instead of recognizing my efforts, the government has chosen to demonize me to fit a false and predetermined narrative. I respect this court and the institution it represents, and I respectfully assert that the inconsistencies and abuses I have highlighted must be addressed.

5.      This court must hold the government accountable, just as I have upheld the law. When power is abused, it must be challenged. I will continue to speak out until justice prevails.

## I.  Introduction

6.      I seek early termination of probation not simply to end the restrictions imposed on me but to escape the continual fear instilled by the government's actions. The government clearly indicated their lack of respect for this court and your honors orders by deed and statement. Monitoring and probation do not grant the government the right to create an environment in which I live in constant fear of their overreach, entrapment attempts, and coercive tactics. Justice demands that I be freed from this control, given the extraordinary circumstances of my case and the government's repeated violations of my rights.

7.      The facts of my case—from pretrial detention through sentencing and probation—demonstrate a clear pattern of disregard for the system and abuse of power. This court has a judicial

duty to recognize the injustice it has allowed to unfold, much of which was based on extrajudicial misinterpretation and false government narratives. I have never engaged in violent conduct, and no evidence exists to suggest otherwise. The government's continued misrepresentation of my actions stems from improper interpretations of extrajudicial information, and this court must now correct the record.

8.    The time has come for the court to grant relief. Should the court not grant early termination, I request that it open a formal investigation into the violations of my rights, recognizing this court's duty to rectify the injustices that have occurred and that have not been addressed.

## II.    Probation Letter: Exceeding Expectations as a Law-Abiding Citizen

9.    The U.S. Probation Office's letter makes it clear that I have "*exceeded expectations*" in terms of my compliance and conduct throughout my probation. I have met every requirement imposed by the court and have done so while dealing with ongoing fear and surveillance by the government. My actions have been those of a responsible, law-abiding citizen, and this fact should weigh heavily in favor of early termination as it is extraordinary.

10.    However, compliance with probation does not mean living in fear of what the government might do next. The monitoring and control imposed by probation have been weaponized against me in ways that were never intended. The DOJ and FBI's actions during this period—including their attempts to entrap me—represent a significant departure from the intended purpose of supervised release. I am not being monitored for public safety or rehabilitation. That notion in and of itself is nothing more than absurd. This unchecked supervision has become a process of further manipulation and attempts to force me to be used as a tool by the government.

11.     This court has the responsibility to ensure that probation is not used as a means of coercion or harassment and that it serves its intended rehabilitative purpose.

12.     The court, therefore, must either grant early termination or convene a formal inquiry into the government's abuse of power during my probationary period. The public's right to know as do my demands of this Court to rectify this situation and if denied then provide an articulable basis as to the specific factors that weighed in favor of denial.

## III.   <u>The Government's Mischaracterization of My Actions and Intent</u>

13.     The DOJ and FBI have engaged in a clear pattern of constitutional violations and misconduct that have tainted every phase of this case, from pretrial detention through sentencing to supervised release. These violations have been built on a foundation of unnecessary outside influences and false narratives, all of which this court relied upon in its initial rulings. The government has shown a clear pattern of misconduct throughout these proceedings— misrepresenting evidence, concealing facts, making false and baseless claims about my actions, and failing to adhere to the standards of fairness and accountability. The government's labeling of groups such as the Proud Boys as extremist organizations is misleading and part of an effort to misrepresent the diverse nature of its membership. I had no connection with the Proud Boys or any other organized group on January 6th and am not accused of any crime in connection with another date; therefore, that association was both unwarranted and erroneous and should never have been a part of the reasoning at sentencing or our discussions at this late juncture.

14.     The government's own evidence, including location data, shows that I remained at the Ellipse while demonstrators breached the Capitol's outer barriers. My actions inside the Capitol were focused on de-escalating the situation. I read President Trump's tweets urging people to leave

and consistently conveyed a message of peace. I have always maintained, "I do not support looting, I do not support violence, I support a peaceful protest."

15.    The ongoing mental anguish caused by the government's actions, particularly their attempts to entrap me and the continuous surveillance I have been subjected to, violates my Fifth Amendment right to due process and my Fourteenth Amendment right to equal protection under the law. There has been no evidence—either during trial or throughout the probationary period—suggesting that I engaged in violent conduct. Any indication otherwise is purely the result of the government's improper use of extrajudicial information.

16.    The court now has a judicial responsibility to correct the record and acknowledge the injustice it has allowed to continue. I have complied fully with the terms of probation, but that does not mean I must endure the fear and intimidation the government continues to impose. As noted in *United States v. Ferrara*, 847 F. Supp. 964 (D. Mass. 1994), the court has the authority to modify or terminate probation when coercive tactics are used by the government. These tactics have no place in the justice system and warrant immediate correction. This court, in recognition of the constitutional violations I have suffered, should grant early termination of probation. If not, it must at least convene an investigation into the systemic abuse that has occurred.

## IV.  Coercive Manipulation and Violations of Court Orders:
Extraordinary Reasonings for Early Termination of Sentence.

17.    I respectfully request that the court consider early termination of my probation based on my extraordinary, exemplary, and "above and beyond" conduct during this process. I have done more than what was required of me. I have served my sentence, paid my fines, and remained law-abiding, all while enduring an unjust campaign of abuse and retaliation by the very government that should have upheld my rights. If my conduct has been deemed extraordinary, then

the extraordinary circumstances surrounding this case—those that I have endured—also demand recognition.

18.     My behavior has been exemplary in every way, far exceeding the court's expectations. Yet while I have upheld the law and cooperated fully, I've faced misconduct, manipulation, and abuse from the government at every stage. If my actions have met or exceeded the expectations of this court, how is it that the government continues to get away with conduct so far below that standard?

19.     Let me remind you of what I have endured:

1.  **So-called Accidental releases of information by the government pretrial**: Confidential information from my proffer was released improperly, violating the law and my rights. Despite this, I remained respectful and trusted the legal process.

2.  **Concealment of information from this court**: The government actively concealed the truth about my role in capturing a fugitive. They begrudgingly provided information, but they reacted only when the fear of prosecutorial misconduct might be uncovered and had made its way to the proceedings.

3.  **Falsely claiming that I was dishonest**: The government has repeatedly tried to cast me as untruthful despite all evidence showing that I've been nothing but honest and transparent. I stood ready to testify and face cross-examination while the government hid behind lies and omissions.

4.  **Retaliation for exposing the truth**: I exposed the government's misconduct, and I was met with retaliation. Instead of addressing their wrongdoing, they doubled down on trying to discredit me, putting me in an even more difficult position.

5.  **Name-calling on the floor of this court**: Rather than sticking to the facts, government actors resorted to personal attacks and name-calling, demeaning the dignity of this process and casting aside the professionalism that should be expected in a court of law.

6.  **Pretending not to know facts**: The government has feigned ignorance about key details and facts that would have exposed their misconduct, sidestepped responsibility, and showed no respect for the truth or this court's time.

7.   **Sidestepping the prosecutor's responsibility**: Prosecutors have continually dodged accountability, violating ethics codes and engaging in conduct that would have resulted in severe penalties for any private citizen.

8.   **FBI misconduct after the fact**: While I was on supervised release, the FBI directly violated this court's orders by attempting to coerce, scheme, bribe, and threaten me. Their actions in March, blatantly illegal and in direct violation of my probation, were an attempt to entrap me and violate my rights further.

20.   Despite these extraordinary abuses, I have remained committed to following the law, cooperating with the legal process, and doing what is expected. I must ask this question: If these facts, known to this court as accurate, are not extraordinary circumstances, then what does this reflect about our justice system? What has become accepted practice, and how far have we drifted from the standards that should be upheld in a court of law?

21.   This court has repeatedly given the benefit of the doubt to the government, allowing them to sidestep responsibility and sweep their misconduct under the rug. Yet, while I face every consequence for my actions, the government continues to act with impunity. If my circumstances do not warrant relief and the extraordinary circumstances I've outlined do not raise alarms, then this court must consider what has been allowed to become "normal" in proceedings.

22.   Courts have the authority to consider recidivism and uphold the rule of law. But when will the misconduct of government actors, who break laws and violate ethics, be part of that conversation and properly considered and addressed? Who have we become when lies, manipulation, and disregard for court orders are treated as acceptable?

23.   If we allow these abuses to continue unchecked, if we allow government actors to entrap, coerce, and break the law without consequence, we erode the very foundation of the justice

system. I respectfully state that the court should teach the government to respect the court and the institution of justice it is designed to represent.

24.     **Enough is enough.** The total weight of these actions must be acknowledged, and this court must act when a pattern behavior of deceit has become evident. I am not asking for leniency or favors—I am asking for fairness, justice, and accountability to be applied to all parties before this court, specifically the government and its responsibility for its agents as an entity.

25.     I have upheld my end of this process with integrity. I ask this court to finally recognize the extraordinary circumstances I've faced and grant early termination of my probation, allowing me to live without fear of continued government overreach. Let us restore faith in the law and the principles this court is supposed to protect. These coercive and manipulative tactics, all while I was under court supervision, present extraordinary reasons for why the court should terminate my sentence early. The FBI's actions violated legal boundaries and subjected me to psychological torment, forcing me into an impossible situation.

**V.     Disparity in Sentencing Between Myself and Jason Charter: The Charter Case**

26.     The disparity in sentencing between my peaceful actions on January 6th and Jason Charter's violent and destructive behavior during the Lafayette Park riot in 2020 highlights the selective and biased nature of the justice system's approach to conservative defendants.

27.     The disparity in sentencing between myself and others who engaged in violent actions, such as Jason Charter, underscores the misapplication of justice in my case. Charter, whose individual actions included violence and destruction of property, received a much more lenient sentence than I did, despite my complete lack of violent conduct.

28.     Again, my conduct has always been peaceful, and yet I have been treated more harshly than even some of those who engaged in actual violence. This court relied on a narrative

of insurrection that was created by the government's misuse of outside/improper information, rather than evidence of any actual threat posed by me. The disparity in sentencing between myself and others like <u>Charter</u> is an injustice that this court must acknowledge and correct by granting early termination of probation.

29.     If early termination is not granted, the court must open an inquiry into the bias and misapplication of precedent that shaped this case. The public deserves to know how these sentencing decisions were influenced by extrajudicial narratives rather than evidence.

30.     I actively sought to de-escalate the situation on January 6th, using my voice to encourage calm, peaceful protest. I engaged in no violence, no property destruction, and no attacks on law enforcement. Yet, I was sentenced to federal prison, where I was held in solitary confinement—conditions far harsher than my actions warranted. Jason Charter, on the other hand, led a violent group that vandalized federal property, including causing over $34,000 worth of damage to a statue. Despite his violent actions, he received a lenient sentence of probation, home detention, and community service.

31.     This glaring disparity in sentencing reflects the government's political motivations and underscores the need for my early release from probation.

## VI.    Government's Reliance on 18 U.S.C. § 1512 at Sentencing

32.     The government's misuse of 18 U.S.C. § 1512 in my case is another clear example of extrajudicial misinterpretation and overreach. This statute was designed to punish obstruction of official proceedings, yet it was applied to non-violent participants like myself who had no intent or action aimed at obstructing justice.

33.     The Supreme Court's decision in *United States v. Fischer* (2023) has clarified that § 1512 requires a direct intent to obstruct, which was absent in my case. Despite this, the

government, led by Mr. Valentini, applied this statute in a manner that was not only unjust but entirely misleading. This misuse of § 1512 has deepened my mental anguish, knowing that I was being punished for a crime I did not commit based on a statute that was not designed for cases like mine.

34.     The court must recognize the misapplication of law in my case and correct it by granting early termination of probation. If the court cannot grant this relief, it should open an inquiry into the government's misuse of § 1512 and the mental toll it has taken on non-violent defendants like myself.

35.     Although I did not plead guilty to 18 U.S.C. § 1512, the government relied heavily on this charge during sentencing to justify their draconian recommendations. The Supreme Court has since clarified that charges under § 1512 require a high threshold of intent, which was absent in my case. The legal landscape has shifted significantly since my sentencing, and this constitutes an extraordinary matter for resolving the early termination of my probation.

## VII.   Split Sentencing Abuse and Improper Judicial Precedents: The James Little Case

36.     The split sentencing abuse in James Little's case, where he received both probation and prison time for a Class B misdemeanor, reflects a broader misapplication of judicial precedent that has similarly affected my case. The improper use of split sentencing in cases like mine has contributed to the fear and mental anguish I have experienced throughout this process.

37.     Knowing that the court has imposed disproportionate punishment on non-violent defendants like me further exacerbates the emotional strain of my probation. Split sentencing, intended for more serious offenses, has been misapplied here, causing me undue suffering. The extrajudicial factors that shaped these decisions must now be corrected.

38.     in recognizing the improper application of split sentencing, be it the use of this court should grant early termination of probation. If it cannot provide this relief, I respectfully request that the court open a formal investigation into the misuse of split sentencing and the public's right to know how these decisions were improperly influenced.

## VIII.   The Fraudulent Actions of Bennie Thompson and the Select Committee

39.     Bennie Thompson and the Select Committee engaged in fraudulent manipulation and destruction of evidence related to January 6th. This fraudulent evidence, including manipulated time stamps, was used against me to create a narrative that conflicts with the actual timeline of events. See, https://www.c-span.org/congress/?chamber=house&date=2022-06-09.

40.     I went on to expose the frauds of the Select Committee that have impacted matters in this district and others and improperly influenced the courts and minds of judges, when I intervened to stop the promotion of this contrived effort to provide false narratives to the American people as it relates to January 6th. See Evans v Olson, Colorado Civil Case No. 2023CV-00689-0001.

41.     The compilation of evidence that clearly shows the false evidence production a gross miscarriage of justice and must be considered in the termination of my probation since the court validated their notice of the committee and reliance on the committee as a reliable government function tied to my proceedings. (See Judgment in this matter, US v. Evans). More importantly particularly in the light of new information since sentencing that has come to be within the public view further supporting my statements at sentencing as I stated then that it would in October and November of 2022 during the first and second sentencing dates. Id.

### IX. Defense of My Statements Regarding Judge Beryl Howell, Judicial Bias, and the Justified Termination of Supervised Release

42**.**    This matter focuses on the rightful termination of my supervised release. However, the government's opposition has provided an opportunity to critically examine the systemic judicial bias and constitutional violations that have permeated the D.C. District Court under the influence of Judge Beryl Howell and her successors. This deeper review exposes the prejudicial framework that has unfairly shaped not only my case but the handling of all January 6th cases, including those involving President Trump and other defendants.

43**.**    My public statements about Judge Howell, particularly my remark that she is "uglier on the inside than on the outside," reflect the broader extrajudicial bias and misapplication of judicial power that has tainted the district court under her leadership. This comment, far from being a superficial critique, underscores the internal notion that corruption within the judicial system exists—corruption that has affected the outcomes of cases by allowing political narratives to take precedence over legal facts. Judge Howell's tenure as Chief Judge not only compromised my case but set the stage for the systemic bias that continues to influence how courts treat January 6th defendants.

### 1. Judge Howell's Leadership and the Normalization of Extrajudicial Bias

44**.**    During her time as Chief Judge, Judge Howell established a prejudicial framework that permitted extrajudicial remarks and the misuse of legal terminology. In turn, an improper and dangerous precedent for how January 6th defendants are viewed and prosecuted was created. Judge Howell set the standard and judicial culture that developed under her leadership allowed such politically charged terms to become normalized, mischaracterizing the defendants' actions and setting the stage for prejudgment before trials even began. Howell referred to January 6th as the "crime of the century." Howell's actions were extraordinarily damaging and absent the

expectations of a fair and impartial review of individual intent.  These statements born in the media and political circus lived on to influence future plea deals as she tainted the future proceedings. See Marshall Cohen, available at *https://www.cnn.com/2021/10/28/politics/dc-federal-judge-january-6-cases/index.html* (October 8th 2021)(last visited October 19, 2024).

45**.**    My case, like many others, has been influenced by this systemic bias. The misapplication of 18 U.S.C. § 1512 to many January 6th defendants, including myself, is emblematic of how Howell's legacy led to the improper expansion of legal statutes to fit a political narrative rather than applying the law in a fair and impartial manner. I was indicted on a felony charge and most importantly when time was set to expire on my offer to make a decision to pleas, I did so with the felony 1512 charge in my head. Section 1512, which addresses the obstruction of official proceedings through the destruction of evidence or tampering with witnesses, has been weaponized to punish those who were simply present at the Capitol, despite their lack of involvement in such obstructive conduct. 18 USC Section § 1512. This misapplication reflects a judicial overreach that has stained the court's handling of these cases.

## 2.   The Use of Incorrect Legal Terminology and Its Consequences

46**.**    The willingness of judges in this district to use incorrect legal terminology, particularly the term "insurrection," is not just a matter of inaccurate language. It reflects a collective mindset within the judiciary that has profound legal consequences. Terms like "insurrection" have specific legal definitions, referring to an organized and violent effort to overthrow the government. None of the defendants in January 6th cases, including myself, have been charged with insurrection. Yet, judges like Judge Boasberg, Senior Judge Kollar-Kotelly, and Judge Tanya Chutkan, in concert with others, have made unsubstantiated references to insurrection in their rulings and minute orders. See 18 U.S.C. § 2383.

47**.**   For example, in a civil case where I quickly prevailed in a defamation matter, the irony was that a Judge chose then to defame me, where Judge Boasberg made an inappropriate reference falsely stating that I had involvement in an "insurrection," despite the fact that no such charge was brought against me or any other defendant. <u>See Evans v Shipley</u>, 1:24-cv-003777-JEB. This extrajudicial statement was not simply an error in terminology; it demonstrated bias that influenced the court's perception of me.

48.   Similarly, Judge Kollar-Kotelly allowed the government to falsely tie me to an insurrection in a court filing and then in lockstep with the runaway mindset of the politically influenced judiciary reiterated the improper statement in her minute order, further perpetuating this mischaracterization. <u>See United States v Thomas,</u> 1:23-cr-00069-CKK.

49**.**   More concerning is that these judges, in using such charged language, are not only making incorrect statements but also engaging in a practice that undermines the legal process. These terms carry severe consequences for defendants, influencing how the court, the public, and even jurors perceive the cases. When a judge improperly conjures such language and invokes "insurrection" without legal grounds, it frames the defendant as part of a treasonous conspiracy, altering the trajectory of the cases and potentially tainting any chance of fair adjudication.

### 3.   <u>Judge Chutkan's Role in Furthering Extrajudicial Bias</u>

50**.**   Judge Tanya Chutkan has played a significant role in furthering the extrajudicial bias that pervades the district. In one of her rulings, Chutkan stated: "This was not a protest; this was a violent attempt to overthrow the government." <u>See US v Palmer,</u> 1:21-cr-328-TC. Such an inflammatory statement, devoid of nuance and unsupported by the specific legal charges, reflects a troubling extrajudicial viewpoint. Judge Chutkan's language is consistent with the politically charged narrative and legal definition of "insurrection" that has been normalized in the district and

is emblematic of the broader collective bias affecting these cases. Id. Her statement effectively prejudges defendants like me by lumping all participants into a single narrative of an organized attempt to overthrow the government, even though no such charge exists in my case or in any others. Id.

51. Judge Chutkan's willingness to employ such inflammatory language aligns her with the broader judicial overreach established by Howell, Boasberg, and Kollar-Kotelly. Id. Her remarks are not only legally improper but also suggest that she is more concerned with reinforcing a political narrative than with maintaining the impartiality required by the judiciary. Id. Chutkan's statements reflect the continuation of a judicial culture that has been corrupted by political bias and the desire to cast January 6th as something far more than what the legal facts support.

**4.  The Collective Judicial Bias in the District Court**

52. If these were isolated incidents, they might be written off as mere errors. However, when we examine the broader context, it becomes clear that these are part of a larger trend within the district court—a trend rooted in the collective extrajudicial bias that began under Judge Howell. The repeated use of politically charged language by multiple judges, including Boasberg, Kollar-Kotelly, and now Chutkan, reflects a collective mindset that prejudges January 6th defendants, undermining the principle of individual justice.

53. This collective bias is particularly troubling because it represents a systemic issue within the district court, one that affects not only my case but all cases related to January 6th, including those involving President Trump. The normalization of prejudicial language like "insurrection" and the misapplication of legal statutes such as § 1512 have created a judicial environment where defendants are presumed guilty by association, rather than being evaluated based on the specific facts and charges against them.

54.     The collective thinking of the judiciary in this district demonstrates a broader failure to uphold the impartiality required of the courts. Judges like Boasberg, Kollar-Kotelly, and Chutkan have allowed political narratives to shape their rulings, thereby contributing to a toxic judicial environment where politically motivated prosecutions are not only accepted but actively encouraged. Id. This bias threatens the constitutional rights of every defendant and calls into question the integrity of the district court as a whole.

### 5.   Judge Howell Impropriety & Trump Derangement Syndrome (TDS)

55.     The influence of the *slang term* that appears to continually have more evidence in support of an actual clinical derangement "Trump Derangement Syndrome" is evident in the district court's handling of January 6th cases. The extrajudicial bias that began under Judge Howell has seeped into the collective thinking of the judiciary, leading to a judicial environment that is deeply hostile to those associated with President Trump, including supporters like me. The district court's inability to separate political narratives from legal facts has resulted in a compromised judicial process that demands the recusal of biased judges and, in many cases, a change of venue to ensure fair trials. See Wikipedia on "TDS", available at https://en.wikipedia.org/wiki/Trump_derangement_syndrome.

56.     Noting new research on Political Obsession Disorder (POD) it is important to realize persons who experience emotional trauma related to political events or figures and have, "In severe cases, anxiety or distress related to politics can **impair an individual's ability to function professionally**, resulting in poor productivity, conflict at work, and even job loss due to the inability to maintain focus and collaboration." See https://neurolaunch.com/political-obsession-disorder/.

57.     Noting Judge Howell's statements about an "overload of cases", many studies could be considered to support the position that judges are not immune from more novel concepts, such as TDS or POD, that are based on accepted social, neurological, and psychological studies.  These cutting-edge studies come from a modern understanding of long-standing peer-reviewed studies which may provide reasoning as to current instability and impropriety has become commonplace. "These heightened stress levels can cause negative outcomes in judges' personal and professional lives. Stress related outcomes can include, but are not limited to, the following: (1) reduced physical and mental health" See *Judges and Stress*: *An Examination of Outcomes Predicted by the Model of Judicial Stress* (2018 Ed.) (Edwards Reichardt Bornstein and Miller).

58.     I respectfully submit that it is possible, based on past actions, that some members of the judiciary may be exhibiting signs, and a close self-examination or outside examination of their own potential for TDS, POD-based derangement could be warranted. I am not qualified to make a clinical diagnosis but personally believe these issues to exist. It is important to note these manifestations are not limited by political affiliation. See Taber, C. S., & Lodge, M., *Motivated skepticism in the evaluation of political beliefs*. American Journal of Political Science, 50(3), 755-769 (2006); Van Bavel, J. J., & Pereira, A., *The partisan brain: An identity-based model of political belief*. Trends in Cognitive Sciences, 22(3), 213-224 (2018); Weeks, B. E., *Emotions, partisanship, and misperceptions: How anger and anxiety moderate the effect of partisan bias on susceptibility to political misinformation*. Journal of Communication, 65(4), 699-719 (2015).

59.     During a public discussion in Texas at an event for Comal County Republican Women, Congressman Chip Roy and I held a public discussion abusive nature of the corrupt D.C. Courts. It was agreed that Beryl Howell was deserving and at the top of the list of judges to be impeached in the district. We agreed in that public forum that if I wrote the impeachment articles

Mr. Roy would carry those articles. The impeachment articles clearly laying out reasons why in fact that Beryl Howell is undoubtedly, as I believed and said "Uglier on the inside than on the outside." An excerpt form the impeachment articles found publicly available are located on my website. See Impeachment Articles of Beryl Howell, available at https://condemnedusa.com/legal-filings/ (last visited October 19, 2024). The basis for my statement derives from a multiple of legal doctrines described in the U.S. Court of Appeals, District of Columbia describing the departure from jurisprudence and reality as:

(1) Trump Investigation: As Chief Judge of the U.S. District Court for the District of Columbia, Beryl Howell presided over several key aspects of the investigation into former President Donald Trump. This included overseeing the handling of document production and other evidence-related matters;

(2)  Document Production: Judge Howell's decisions regarding the production of documents to Congress, particularly in the context of the Trump investigation, were notably controversial. She ordered the production of documents that many argued were protected by executive privilege and other legal protections;

(3) Appellate Court Criticism/Appellate Reversal: The U.S. Court of Appeals for the District of Columbia Circuit criticized Judge Howell's decisions in this matter, finding that her orders were overly broad and failed to adequately protect privileged information. The appellate court essentially "slammed" her for making rulings that disregarded well-established legal principles regarding executive privilege and the confidentiality of certain communications; and

(4) Legal and Ethical Concerns: The appellate court's harsh critique of Howell's rulings raises serious concerns about her ability to apply the law impartially and with due regard for constitutional protections. Her eagerness to facilitate the production of documents to Congress, despite significant legal objections, suggests a potential bias or willingness to support politically motivated investigations at the expense of legal norms.

60.    The presence of Trump Derangement Syndrome within the judiciary is not just a theoretical concern—it is a demonstrable reality. The misapplication of the law, the inappropriate use of legal terminology, and the extrajudicial statements made by Howell, Boasberg, Kollar-Kotelly, and Chutkan all point to a judiciary that is more concerned with political retribution than

with upholding the rule of law. The collective bias of the district court has compromised the fairness of these cases, and immediate action must be taken to ensure that defendants are judged based on evidence and legal standards, not political affiliation. Id.; See also Ramstack, The Well News: Ethics Complaint House Representative Elise Stefanic, available at https://www.thewellnews.com/courts/congresswoman-accuses-federal-judge-of-ethics-breach-for-political-statements/ (last visited October 20, 2024).

61.     "Stefanik's complaint, submitted to the D.C. Court of Appeals, cited Canon 2B of the Code of Judicial Conduct in saying, "Judge Howell's speech is plainly inappropriate, consisting of partisan statements, election interference and improper extrajudicial statements while criminal cases are pending." Id.

**6.   The Severe Impact of Judicial Bias on All January 6th Defendants**

62.     The improper references to "insurrection" and the misapplication of § 1512 have had a devastating impact on the ability of January 6th defendants to receive fair trials. The extrajudicial bias exhibited by Howell, Boasberg, Kollar-Kotelly, and Chutkan has created a prejudicial framework that taints not only the defendants' reputations but also the legal process itself. This bias influences how jurors perceive the defendants, how charges are applied, and how sentences are determined.

63.     The broader implications of this systemic bias extend far beyond my case. If the judiciary continues to operate under this framework, it will not only result in unjust convictions but will also erode public confidence in the judicial system. The stain on the judiciary caused by this collective bias cannot be ignored. It calls for a complete review of all January 6th cases, as well as the recusal of judges who have demonstrated clear extrajudicial bias. Furthermore, the

pervasive influence of Trump Derangement Syndrome within the district makes it necessary to consider a change of venue for future prosecutions to ensure impartiality.

### 7.    Conclusion: The Justified Termination of Supervised Release and the Broader Implications for Judicial Reform

64.    The rightful termination of my supervised release is justified not only by my compliance and conduct but also by the systemic bias that has influenced my case from the beginning. The inappropriate references to "insurrection" by Judge Boasberg, Judge Kollar-Kotelly, and Judge Chutkan are not isolated incidents—they are part of a broader collective bias that began under Judge Howell and continues to influence the district court's handling of January 6th cases. This bias has created a judicial environment where political narratives have replaced impartial legal judgment.

65.    The misapplication of § 1512, the use of politically charged language, and the extrajudicial statements made by judges in this district all point to a judiciary that is deeply compromised by Trump Derangement Syndrome. The continued prosecution of January 6th cases in this environment represents a grave injustice, one that demands immediate judicial review, recusal of biased judges, and, in many cases, a change of venue.

66.    The systemic constitutional violations and extrajudicial bias that have affected my case and others must be addressed to restore the integrity of the judicial process. The stain on the judiciary caused by Howell's legacy, and perpetuated by Boasberg, Kollar-Kotelly, and Chutkan, is a matter of grave concern. Without immediate action, the fairness of all January 6th cases will remain in question, and the rule of law will continue to be undermined by political narratives rather than legal standards.

**X.   Under *Riddle*, the Sentence Imposed Here Exceeded the Bounds of the Statutory Maximum and Should Not Have Exceed One-Year.**

67.     My sentence of intermittent confinement and three years of supervised release for a single Class A misdemeanor exceeds the statutory authority under federal law. US v Riddle, Case 1:21-cr-00304-DLF (Filed 08/21/23).

68.     Specifically, 18 U.S.C. § 3561(a)(3) prohibits the imposition of both imprisonment (including intermittent confinement) and probation or supervised release for a non-petty offense, such as a Class A misdemeanor. Class B misdemeanors are considered petty offenses, whereas a Class A misdemeanor, is not, and such carries a maximum sentence of up to one year in prison. (see 18 U.S.C. § 3559(a)(6)). Intermittent confinement is treated as a form of imprisonment. This was recognized in United States v. Forbes, which held that intermittent confinement, though served on non-consecutive days, is still a form of imprisonment. Given this, the combination of both intermittent confinement and supervised release for a non-petty offense is unlawful under 18 U.S.C. § 3561(a)(3).

69.     Overall, under 18 U.S.C. § 3583(b), the maximum term of supervised release for a Class A misdemeanor is limited to one year. Therefore, my sentence was improper from the outset because it violated the statutory limits on both probation and supervised release for non-petty misdemeanors. In my case, the court imposed three years of supervised release—a term exceeding the statutory maximum.

70.     At most my sentence should have been confined to one year, either through incarceration or supervised release. Currently, I have now completed more than one year of his sentence. As such, his supervised release should be concluded immediately, as the legal maximum has already been exceeded.

71.     In addition to government misconduct, an excessive sentence, I have established exemplary behavior and completion of all my supervision goals. I have fully complied with all conditions, completed my period of intermittent confinement, paid restitution and fees immediately upon being imposed, and actively participated in his required counseling and rehabilitation programs.

72.     As explained in my initial filing of this motion, a letter from my probation officer confirms that I have exceeded the expectations of someone on federal probation. This letter acknowledges that I pose no risk to public safety and has fulfilled all the requirements of my supervision.

73.     Under 18 U.S.C. § 3583(e)(1), the court may terminate supervised release early if warranted by the defendant's conduct and if it is in the interest of justice. In light of my full compliance, rehabilitative efforts, and exceeding of expectations, continued supervision serves no further purpose and should be terminated.

## XI.   <u>Conclusion</u>

74.     I respect this court and the rule of law. My sentence of both intermittent confinement and three years of supervised release is further improper because the entirety of his sentence should have been concluded within one year, based on statutory limits.

75.     However, the government's ongoing abuse of power has shown that it cannot be trusted to act in good faith. I have upheld my end of the probationary conditions, but the government has consistently violated court orders, coerced me into illegal actions, and demonstrated a clear disregard for justice. The night and day distinction as to the genuine nature and respect for the court through deed and action vs. the extraordinary lack of candor by

the government make it abundantly clear that in the interest of justice should prevail approving early termination.

76.     My conduct being extraordinary is exemplified further by my dedication to legal outlets for my expression.  I filed a motion to intervene, exposing numerous frauds, lies, and omissions that originated with the Select Committee that spread, like cancer, becoming erroneously accepted in the courts. Id. The evidence list shows how disturbingly inaccurate the Select Committee hearings were placed on the record in both my civil case. Evans v Olson, supra.

77.     For example, in a motion to intervene, an attorney wrote the following: "the entire evidence list in the motion to intervene in the trial court can be found in the filing that exposed Eric Olson, who, as the counsel representing Citizens for Responsible Ethics in Washington (CREW), operated from the misinterpretation that the video production by Bennie Thompson and the Select Committee was accurate." See Norma Jean Anderson, et al. case; Evans v Olson, supra (Evans motion to intervene).

78.     I ultimately filed an amicus brief with my counsel, who represented me and Condemned USA in the United States Supreme Court, to further bring to attention the misdirection and offkey ideology of those who use words like insurrection. This shows the court another extraordinary example of a complete 180-degree change to how I deal with my political discourse; in sharp contrast to marching with a megaphone, I am using my voice in the legislative and court process to make my position and the truth known. Regardless of agreement or dissent to my positions by the government, this is the Constitutionally correct and legal method that is beyond reproach.  See   Amicus   Brief,   CondemnedUSA   available   at https://www.google.com/search?q=condemned+usa+supreme+court&rlz=1C1CHZN_enUS1052 US1053&oq=condemned+usa+supreme+court&gs_lcrp=EgZjaHJvbWUyCAgAEEUYJxg5MgY

IARBFGEAyBggCECMYJzIKCAMQABiABBiiBDIKCAQQABiABBiiBDIKCAUQABiABBi

iBDIKCAYQABiABBiiBDIGCAcQRRg80gEJMTYxNTJqMWo3qAIIsAIB&sourceid=chrome

&ie=UTF-8.

79.     Considering the Supreme Court's recent rulings being paramount related to 1512, the indisputable fraudulent evidence production in the June 9, 2022 video production by The Select Committee provided during public hearings, the indisputable fraudulent testimony by officers who perjured themselves in Select Committee testimony, and the extraordinary circumstances I have endured present a clear and compelling case for the early termination of my probation. Justice, fairness, and the rule of law demand that this court grant my request for early termination. See United States v Fischer, 23-5572, available at https://www.theblaze.com/columns/analysis/analysis-did-pelosis-security-chief-perjure-himself-in-oath-keepers-trial (Steve Baker October 4, 2023); See "A Day in The Life of Harry Dunn" https://www.theblaze.com/news/damning-video-exposes-former-capitol-police-officer-harry-dunns-tortured-relationship-with-jan-6-truth; See also https://www.c-pan.org/congress/?chamber=house&date=2022-06-09 (last visited October 20, 2024).

80.     In light of this, I ask your Honor, with all due respect this court deserves, that this court deserves to terminate my sentence condition of supervised release in the interest of justice.


**WHEREFORE**, I respectfully request that the requested relief be granted in its entirety.

Respectfully Submitted,


*/s/ Treniss Evans*

_____

TRENISS EVANS